RECORD NO. 16-1295

In The

# United States Court of Appeals
### For The Fourth Circuit

## TERRI L. SMYTH-RIDING,

*Plaintiff – Appellant*,

**v.**

## SCIENCES AND ENGINEERING SERVICES, LLC; HYO SANG LEE,

*Defendants – Appellees*,

**and**

## SCIENCES AND ENGINEERING SERVICES, INC.,

*Defendant*.

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND AT BALTIMORE**

———————————

**BRIEF OF APPELLANT**

———————————

Gary M. Gilbert
Katherine R. Atkinson
LAW OFFICES OF GARY M. GILBERT
  & ASSOCIATES, PC
1100 Wayne Avenue, Suite 900
Silver Spring, Maryland  20910
(301) 608-0880

*Counsel for Appellant*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. 16-1295        Caption: Terri Smyth-Riding v. Sciences and Engineering

Pursuant to FRAP 26.1 and Local Rule 26.1,

Terri Smyth-Riding
(name of party/amicus)

who is _____ Appellant _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?                              ☐ YES ☑ NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                              ☐ YES ☑ NO
      If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
    If yes, identify any trustee and the members of any creditors' committee:


Signature: _____    Date: _____ April 5, 2016 _____

Counsel for: Appellant _____

## CERTIFICATE OF SERVICE
***************************

I certify that on _____ April 5, 2016 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

David C Tobin
Ziad P Haddad
Tobin OConnor and Ewing
5335 Wisconsin Ave NW Ste 700
Washington, DC 20015
dctobin@tobinoconnor.com
zphaddad@tobinoconnor.com


_____    _____ April 5, 2016 _____
       (signature)                    (date)

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................v

JURISDICTIONAL STATEMENT .......................................................1

ISSUES PRESENTED FOR REVIEW ..................................................1

STATEMENT OF THE CASE ..............................................................1

STATEMENT OF FACTS ....................................................................4

    I.     SES's Interviews of Smyth-Riding ..................................4

    II.    Smyth-Riding's Role at SES .............................................5

    III.   Supervision of Smyth-Riding...........................................7

         A.    Dr. Lee and Richard Lee ........................................7

         B.    Serino ....................................................................8

    IV.   Smyth-Riding's Reports of Discrimination ......................8

         A.    Pay Disparities .......................................................8

         B.    Selection of Executive Assistant/Receptionist ..........9

         C.    Joe's Employment Practices ....................................10

             1.    Termination of Zakia Harris ..........................11

             2.    Hiring of Accounts Payable and Payroll Employees....................................................12

         D.    Inappropriate Interview Questions...........................13

    V.    Interactions Between Joe and Smyth-Riding ....................14

i

VI.     Smyth-Riding's Performance ................................................15

VII.    2008 Christmas Party ...................................................16

VIII.   Costpoint, and 2008 Pay Raise and Bonus...........................17

IX.     Termination and Replacement ......................................18

    A.      January 6 and January 9, 2009 Meetings..................................18

    B.      Decision Maker ........................................................19

    C.      Reasons for Termination........................................20

    D.      Replacement ................................................21

SUMMARY OF THE ARGUMENT .....................................................21

STANDARD OF REVIEW AND APPLICABLE LAW .......................................23

ARGUMENT ........................................................................24

I.      A Jury Could Find Appellees Retaliated Against Smyth-Riding
        When Firing Her And Effectively Decreasing Her Salary ................24

    A.      Smyth-Riding Engaged in Protected Activity and
        Appellees Subjected Her to Adverse Employment
        Actions when They Fired Her and Effectively Decreased
        Her Salary ................................................25

    B.      Smyth-Riding Presented Evidence from which a Jury
        Could Find Causation ..............................................28

        1.      Smyth-Riding participated in protected activity
            immediately prior to the "terrible" raise and the
            termination of her employment ......................................30

        2.      Appellees' implausible and contradictory
            articulated reasons are evidence of causation................31

ii

a.  A jury could infer that retaliatory animus
motivated Appellees to fire Smyth-Riding ..........31

b.  Appellees failed to articulate a legitimate
reason for effectively decreasing Smyth-
Riding's salary......................................................35

3.  The Record also Demonstrates Causation Through
the "Cat's Paw" Theory Articulated by the
Supreme Court in *Staub v. Proctor Hospital* .................36

II.  The District Court Erred When It Granted SES's Rule 50
Motion On Smyth-Riding's Sex Discrimination Claim Without
Explanation......................................................................40

A.  Smyth-Riding Established a *Prima Facie* Case of
Discriminatory Discharge .........................................41

B.  The Same Actor Inference does not Apply to Smyth-
Riding's Termination ................................................44

III.  The District Court Applied the Wrong Standard of Law When
Considering Defendants' Motion for Judgment as a Matter of
Law ...............................................................................45

A.  The District Court Improperly Made Factual
Determinations and Drew Inferences in Favor of
Appellees..................................................................45

1.  Joe's termination of Harris and hiring of Ng.................45

2.  Conflict between Joe and Smyth-Riding.......................47

3.  Lee's knowledge of Smyth-Riding's protected
activity ...........................................................49

4.  The role of human resources .........................................50

B.    The District Court improperly ignored the circumstantial evidence of discrimination and retaliation.................................51

1.    The District Court improperly ignored the evidence of sex discrimination ........................................51

2.    The District Court improperly ignored the evidence of retaliation ....................................................54

CONCLUSION........................................................................................55

STATEMENT REGARDING ORAL ARGUMENT .............................................55

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Anderson v. Liberty Lobby, Inc.*,
　　477 U.S. 242 (1986)................................................................23

*Arthur v. Pet Dairy*,
　　593 Fed. Appx. 211 (4th Cir. 2015) .............................................29

*Brown v. McLean*,
　　159 F.3d 898 (4th Cir. 1998) .....................................................43

*Brown v. Nucor Corp.*,
　　785 F.3d 895 (4th Cir. 2015) .....................................................37

*Bryant v. Aiken Reg'l Med. Ctrs., Inc.*,
　　333 F.3d 536 (4th Cir. 2003) ........................................... 27, 42-43

*Burlington Northern and Santa Fe Ry. Co. v. White*,
　　548 U.S. 53 (2006).................................................................27

*Burrage v. United States*,
　　134 S. Ct. 881 (2014)...........................................................28, 29

*Clark County Sch. Dist. v. Breeden*,
　　532 U.S. 268 (2001)...............................................................30

*Dennis v. Columbia Colleton Medical Center, Inc.*,
　　290 F.3d 639 (4th Cir. 2002) ...........................................23, 43, 45

*Desert Palace Inc. v Costa*,
　　539 U.S. 90 (2003)................................................................41

*Edelman v. Lynchburg College*,
　　300 F.3d 400 (4th Cir. 2002) .....................................................23

*EEOC v. Navy Federal Credit Union*,
    424 F.3d 397 (4th Cir. 2005), *cert. denied*,
    547 U.S. 1041 (2006) .................................................................................26

*Foster v. Univ. of Maryland-Eastern Shore*,
    787 F.3d 243 (4th Cir. 2015) ........................................................29, 30, 31

*Furnco Constr. Corp. v. Waters*,
    438 U.S. 567 (1978).................................................................................42

*Hemi Group, LLC v. City of New York*,
    559 U.S. 1 (2010)................................................................................ 37-38

*Hill v. Lockheed Martin Logistics Mgmt., Inc.*,
    354 F.3d 277 (4th Cir. 2004) ....................................................37, 40, 41, 50

*Holland v. Wash. Homes, Inc.*,
    487 F.3d 208 (4th Cir. 2007) ......................................................................25

*James v. Booz-Allen & Hamilton, Inc.*,
    368 F.3d 371 (4th Cir. 2004) ......................................................................27

*King v. Rumsfeld*,
    328 F.3d 145 (4th Cir. 2003) ......................................................................30

*Lauer v. Schewel Furniture Co., Inc.*,
    84 F. App'x 323 (4th Cir. 2004)............................................................28, 31

*Laughlin v. Metropolitan Wash. Airports Auth.*,
    149 F.3d 253 (4th Cir. 1998) ...............................................................26, 27

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)...................................................................................44

*McDonnell Douglas Corp. v. Green*,
    411 U.S. 792 (1973)............................................................................*passim*

*Miles v. EEOC*,
    429 F.3d 480 (4th Cir. 2005) ...................................................40, 42, 43, 44

*Page v. Bolger*,
   645 F.2d 227 (4th Cir. 1981) ........................................................27

*Price Waterhouse v. Hopkins*,
   490 U.S. 228 (1989)....................................................................41

*Proud v. Stone*,
   945 F.2d 796 (4th Cir. 1991) ........................................................44

*Pulley v. KPMG Consulting, Inc.*,
   348 F. Supp. 2d 388 (D. Md. 2004), *aff'd*,
   183 F. Appx 387 (4th Cir. 2006) ........................................... 25-26

*Reeves v. Sanderson Plumbing Prods., Inc.*,
   530 U.S. 133 (2000)....................................................................23

*St. Mary's Honor Ctr. v. Hicks*,
   509 U.S. 502 (1993)....................................................................26

*Staub v. Proctor Hospital*,
   131 S. Ct. 1186 (2011)............................................................36, 37

*Texas Dep't of Community Affairs v. Burdine*,
   450 U.S. 248 (1981)........................................................26, 28, 31

*Univ. of Teas. Sw. Med. Ctr. v. Nassar*,
   133 S. Ct. 2517 (2013)..........................................................28, 29

*Wexler v. White's Fine Furniture, Inc.*,
   317 F.3d 564 (6th Cir. 2003) ......................................................44

*Young v. United Parcel Serv., Inc.*,
   707 F.3d 437 (4th Cir. 2013) ......................................................37

## STATUTES

28 U.S.C. § 1291 ..............................................................................1

28 U.S.C. § 1331 ..............................................................................1

42 U.S.C. § 2000e-2(m) .........................................................................41

42 U.S.C. § 2000e-3(a) ..........................................................................29

**RULES**

Fed. R. App. P. 34(a)(2) ........................................................................55

Fed. R. Civ. P. 50 ......................................................................23, 37, 40

**OTHER AUTHORITY**

John H. Langbein et al., History of the Common Law 475
(Wolters Kluwer 2009) .................................................................. 55-56

## JURISDICTIONAL STATEMENT

Jurisdiction existed in the district court under 28 U.S.C. § 1331, as this matter contains a federal question.

Jurisdiction exists in this Court on appeal pursuant to 28 U.S.C. § 1291. The United States District Court for the District of Maryland, Baltimore Division, entered judgment as a matter of law in favor of Appellees Science and Engineering Services, Inc. ("SES") and Hyo Sang Lee ("Lee"), and dismissing all claims on February 25, 2016. Appellant Terri Smyth-Riding ("Smyth-Riding") timely filed a notice of appeal on March 22, 2016.

## ISSUES PRESENTED FOR REVIEW

1.    Whether the District Court erred as a matter of law when it held that Smyth-Riding did not present sufficient evidence to meet her burden of proof in her claims of retaliation by SES and Lee, and sex discrimination by SES.

2.    Whether the District Court erred as a matter of law when it failed to consider the evidence in the light most favorable to Smyth-Riding, and drew inferences in favor of SES and Lee.

## STATEMENT OF THE CASE

The instant appeal stems from the District Court's grant of judgment as a matter of law in favor of SES and Lee, and dismissal of Smyth-Riding's complaint of discrimination and retaliation.

Smyth-Riding was the Director of Human Resources for SES from June 2007 until January 12, 2009. JA357:12-13; JA645-46. During the course of her employment, Smyth-Riding observed many instances of what she believed to be discriminatory practices by SES management, including hiring and firing employees based on race, sex and age. JA381:24-25; JA381:25-JA382:1; JA363:4-13; JA375:5-11; JA525:1-3. Smyth-Riding addressed her concerns regarding the perceived discrimination to Director of Operations Robert Serino ("Serino"), Senior Vice President Randal Castro ("Castro"), Controller Daniel Joe ("Joe"), and outside counsel for SES. JA375:5-11; JA525:1-3; JA364:2-4; JA364:8-9; JA655; JA670. On January 12, 2009, Castro and Serino informed Smyth-Riding that she was fired. JA403:10-19. They presented a letter to her that stated her termination was necessary because her personality no longer fit SES's needs. JA645-46.

Smyth-Riding filed the Complaint in this matter on March 1, 2011. Dkt. 1. Defendants moved for summary judgment on December 23, 2013. Dkt. 64. The District Court granted in part and denied in part Defendants' motion on September 29, 2014. Dkt. 82; JA16-58. A jury trial was held on February 22-24, 2016. Dkt. 131-133.

During the trial, Smyth-Riding presented testimony from Castro and Serino denying any involvement in the decision to terminate Smyth-Riding's

2

employment, JA138:5-6; JA149:7-11; JA172:23-24, and testimony from Lee that Serino suggested firing Smyth-Riding, JA262:20-21; JA264:12-14.  Lee's testimony during the trial repeatedly contracted the testimony of other witnesses, his own prior testimony, and the documents in evidence.

Smyth-Riding also presented testimony that Defendants terminated her employment because of her conflicts with Joe, and that Joe, not Smyth-Riding, was the instigator of the conflicts.  JA688; JA128:16-23; JA697.  Testimony during the trial demonstrated that Smyth-Riding's conflicts with Joe centered on her concerns that he engaged in discriminatory practices in hiring and firing employees. JA127:6-12; JA670-72.  Smyth-Riding also presented evidence that Serino, Lee, and Lee's son Richard, directed Smyth-Riding to hire a young, attractive female for an executive assistant/receptionist position, and that Smyth-Riding objected to these instructions.  JA381:24-25; JA690; JA396:1-4; JA397:7-11; JA384:1-10; JA381:25-JA382:1.

At the conclusion of Smyth-Riding's case, Defendants moved for judgment as a matter of law on all claims.  JA579:16-22.  Rather than require Defendants to articulate their reasons for the motion, the Court immediately announced a lack of understanding of the case, asked a series of questions of Smyth-Riding, and stated conclusions of fact.  JA579:25-580:1 ("I really don't fully understand this case, Ms. Dave."); JA582:12-15 ("I mean, they can hire . . . a college graduate from

3

University of Maryland with potential.  I mean, nobody's going to object to that.  I mean . . . you just can't do it, not at all."); JA582:21-25 ("I mean, there is a gap.  And the gap is, I will admit that in my mind I could be wrong.  It is confused by the fact that you called the two immediate supervisors as your witnesses.  I mean, that . . . is causing some confusion in my mind.  And I may not be thinking clearly."); JA594:17-18 ("Is it illegal to decrease somebody's salary?  I mean, I don't get that."); JA597:7-9 ("A Human Relations Director, or Vice President, whoever, doesn't hire people in operational positions.  That's just not how the world works."); JA603:23-25 ("I mean, the only reasonable inference is that [Joe] was ticked off because Ms. Smyth-Riding was trying to run his department.").  The Court then granted Defendants' motion on all counts.  JA609:1-8.

STATEMENT OF FACTS

## I.    SES's Interviews of Smyth-Riding

Smyth-Riding applied for the position of Director of Human Resources for SES in April 2007.  JA38:22.  Serino and Richard Lee conducted the first interview of Smyth-Riding.  JA349:4-8; JA328:17-18.  Lee and Russell Chunn, Chief Financial Officer, subsequently interviewed Smyth-Riding.  JA328:6-15.  During his interview of Smyth-Riding, Chunn told Smyth-Riding that he might ask her some questions that he should not because he did not "know much about H and

4

R." JA351:19-25. Chunn went on to ask Smyth-Riding if she had any children and if she planned to have any more. JA352:24-JA353:5.

Lee also prefaced his interview of Smyth-Riding with a warning that he did not "know much about H and R." JA354:4-9. After discussing the company's organizational structure and the senior leadership team, Lee asked Smyth-Riding how old she was. JA354:14-20. Smyth-Riding was surprised by this question, and advised Lee never to ask that question in an interview. JA354:22-JA355:2. Lee laughed in response. JA355:2. Smyth-Riding answered Lee's question, and also asked him why her age was important to him. JA355:3-5. Lee told Smyth-Riding that he "just wanted to see if [she was] flexible." JA355:4-5.

## II.    Smyth-Riding's Role at SES

Smyth-Riding became the Director of Human Resources for SES in June 2007. JA652; JA357:12-13. In this role, Smyth-Riding was "responsible for all HR functions" for the entire company, including both SES's Maryland and Alabama locations. JA652; JA279:2-5; JA351:1-3. Smyth-Riding worked from the Maryland office. JA351:1-3. In her role, Smyth-Riding oversaw recruitment efforts, selections, onboarding, and terminations. JA359:7-12; JA179:1-3. Smyth-Riding was also "responsible for all HR functions in terms of policy, planning, operations and support, [and] working with senior management . . . ." JA652.

5

The work hours for SES's Maryland office were generally 9 am to 5 or 6 pm. JA358:5-7. Smyth-Riding regularly worked more than eight hours a day, at times staying until 8 or 9 pm. JA358:10-22. As an exempt employee, Smyth-Riding received instructions to enter eight hours a day on her timecards, no matter how many hours she worked. JA413:1-13; JA413:22-25.

Smyth-Riding traveled to SES's Huntsville, Alabama facility shortly after she became the Director of Human Resources to meet with senior leaders and introduce herself to the employees at that location. JA357:22-24. Smyth-Riding continued to travel to Alabama twice a month during the first few months of her employment. JA360:16-29. In October 2007, Smyth-Riding selected Matt Boyett as the Human Resources Administrator for the Alabama facility. JA360:21-23; JA654. Smyth-Riding hired Boyett to handle the day-to-day human resources issues in Huntsville. JA360:21-22. As a result, she did not need to travel to Alabama as frequently. JA360:20-21.

Boyett reported to Smyth-Riding and they had frequent communications regarding human resources matters. JA360:22-23; JA361:10-12. Boyett did not have the same level of human resources experience as Smyth-Riding. JA362:3-4. Smyth-Riding had experience in a wide spectrum of human resources topics, while Boyett's experience was limited to "administering ancillary benefits," such as sick

and annual leave, leave granted under the Family Medical Leave Act, and short

and long-term disability.  JA361:24-JA362:2.

## III.    Supervision of Smyth-Riding

### A.    Dr. Lee and Richard Lee

Smyth-Riding initially reported directly to Lee.  JA652.  In August 2007,

Lee's son Richard directed Smyth-Riding to submit her leave requests to him.

JA807.  According to Richard Lee, this change was necessary because Lee was

concerned that Smyth-Riding often was not in the office.  JA807.  Richard Lee also

informed Smyth-Riding that he wanted to set up weekly meetings with her to

discuss human resources goals and projects.  JA807.  Smyth-Riding agreed to

schedule the weekly meetings, and also explained to Richard Lee that her recent

absences were the result of pre-approved leave.  JA807.

At the time of the change in oversight of Smyth-Riding's leave request,

Richard Lee was a financial analyst for SES.  JA325:15-16.  Richard Lee, who

owned approximately 20 percent of the company, reported directly to his father.

JA325:23-24; JA300:20-21.  Richard Lee played a role in the hiring of both

Smyth-Riding and Boyett.  JA328:17-18; JA654; JA361:17-21.  Although he had

limited knowledge or experience with human resources matters, JA329:12-17,

Richard Lee remained involved in human resources during Smyth-Riding's

employment, JA362:11-13 ("So Richard had oversight.  We worked together on a

number of projects, and I know that Richard was part of my world in HR.");

JA655.

### B.    Serino

In February 2008, Lee instructed Serino to supervise Smyth-Riding.

JA170:7-9.  Lee did not give Serino any reason for his decision, and did not

provide him with any guidance on supervising Smyth-Riding.  JA170:10-11;

JA267:19-25.  As Smyth-Riding's supervisor, Serino never disciplined Smyth-

Riding.  JA177:8-12.  Serino also never counseled Smyth-Riding regarding her

time and attendance.  JA541:8-10.  On one occasion, Serino informed Smyth-

Riding that Lee was concerned that she frequently arrived at work at 10 am.

Smyth-Riding provided copies of emails she sent from the office before 10 am to

establish that she regularly arrived well before 10 am.  JA541:16-21.  Serino

subsequently told Smyth-Riding that he had shared the information with Lee, and

that there was no problem.  JA541:22-25.

### IV.   Smyth-Riding's Reports of Discrimination

### A.    Pay Disparities

During her employment with SES, Smyth-Riding raised concerns regarding

discrimination several times.  In one instance, Smyth-Riding learned of employees'

concerns regarding compensation shortly after she started with SES.  JA485:4-7;

JA489:10-25.  Smyth-Riding then investigated possible differences in pay based on

8

the sex or race of employees.  JA490:1-6.  As a result of the investigation, Smyth-Riding emailed Dr. Coorg Prasad, Vice President of Research and Development, regarding pay disparities between male and female employees, in particular a female employee named Edie Sears.  JA490:1-25.

### B.    Selection of Executive Assistant/Receptionist

For much of 2008, Smyth-Riding was concerned with the directions she received from Serino and Lee regarding the hiring for an executive assistant/receptionist position.  During the process, Serino directed Smyth-Riding to limit her search to young candidates.  JA381:24-25.  Smyth-Riding learned that this instruction, particularly to find applicants directly out of high school, came from Lee.  JA381:24-25 ("Dr. Serino told me that Dr. Lee was looking for someone very young."); JA690; JA396:1-4; JA397:7-11.  In July 2008, Lee reviewed applications for the position and wrote that one applicant, who he perceived to be in her mid-forties, was "too old."  JA653; JA299:4-8; JA299:20-22.  Serino also rejected a group of candidates, throwing the applications into the air and telling Smyth-Riding, in front of another employee, that they were too old.  JA384:1-10; JA573:21-JA574:1-2.  Richard Lee played a role in the selection process as well, telling Smyth-Riding that SES was looking for someone young and attractive to sit outside his father's office.  JA381:25-JA382:1; JA390:3-5.

Richard Lee asked Smyth-Riding to bring in some "chicks" for interviews so he could hit on them. JA390:6-8.

Smyth-Riding reported her concerns to Serino. JA382:8-10. In response, Serino advised Smyth-Riding to be a team player, and that they would do what Lee wanted. JA382:12-14; JA382:12. When the direction to hire a young, attractive female for the position persisted, Smyth-Riding shared her concerns with Castro. JA135:5-7 ("[S]he felt that they were not having their aperture wide enough in that hiring process . . ."); JA135:9-10 ("I think she felt that they were looking specifically for a young person, young in age person."). He believed her, and spoke with Serino. JA145:22-JA146:1; JA136:3-9. Serino confirmed to Castro that SES was looking for someone new to the work force. JA136:12-13. Smyth-Riding did not address the issue with Richard Lee because he was the son of the president of SES. JA390:20-22. She did not counsel Lee regarding his directions to hire someone out of high school, or his comment about the age of an applicant, because she understood that he had no interest in, or time for, human resources. JA394:4-6.

### C.    Joe's Employment Practices

Smyth-Riding was concerned with several of Joe's employment practices in 2008, and raised the issue with Joe, multiple members of management, and SES's attorneys.

10

### 1.    Termination of Zakia Harris

In April 2008, Joe informed Smyth-Riding that he planned to fire African American payroll specialist Zakia Harris, who was in her probationary period. *See* JA363:2-15. Joe first told Smyth-Riding that he planned to terminate Harris' employment because of the mistakes she had made. JA365:10-13. When Smyth-Riding reminded Joe that an Asian payroll employee made many mistakes, Joe pulled out a list of other reasons. JA365:13-20. Joe presented his additional reasons for his decision, which did not appear to Smyth-Riding to be legitimate. JA364:15-18; JA365:20-25; JA366:1-20. Smyth-Riding told Joe that she was not comfortable with the plan to terminate Harris. JA366:25-JA367:1.

Due to her concerns about Joe's reasons for his decision, and that it might be the result of discrimination, Smyth-Riding told Joe to give her a few minutes to think about it. JA364:15-18; JA367:1-4. Smyth-Riding then contacted SES's attorney, and met with Serino and Prasad to discuss her concerns regarding Joe's decision and the motivation for it. JA367:10-13. While Smyth-Riding was meeting with Serino and Prasad, Joe came in and told Smyth-Riding that he had already fired Harris. JA367:14-16. Although Smyth-Riding did not bring her concerns of discrimination to Lee, she did address them with two levels of management, as well as Richard Lee. JA364:2-4; JA364:8-9; JA655; JA670 ("Not

only did Richard get involved, but Dr. Serino, Dr. Prasad and our attorney were called in.").

## 2.    Hiring of Accounts Payable and Payroll Employees

Smyth-Riding's concerns regarding Joe's employment practices extended to his hiring for three positions.  In early 2008, Joe reviewed applications for an accounts payable position.  JA372:18-21.  During the selection process, Joe asked Smyth-Riding to forward all applications directly to him, and not to conduct an initial review or screening of applicants as she did for other positions.  JA370:12-23.  When Smyth-Riding saw the applicants Joe selected for interviews, she observed that they were all Asian, which was not reflective of the pool in the Baltimore metropolitan area.  JA370:24-JA371:4.  Smyth-Riding was concerned about discrimination, and addressed it with Serino.  JA372:8-11.

Smyth-Riding became concerned for a second time when Joe interviewed candidates to replace Harris.  JA372:22-25.  Joe again asked Smyth-Riding not to be part of the selection process.  JA373:3-6.  When Joe sent Smyth-Riding the applications of the candidates he was considering, she observed that the last names of the candidates appeared to be European.  JA373:11-21.  She had the impression again that Joe's selected candidates did not reflect the expected applicant pool for the area, which should be predominately African American.  JA373:11-21.

Smyth-Riding again believed that Joe's hiring decisions were motivated by race in October 2008 when he selected a new accounts payable specialist. JA374:1-2.  For this position, Smyth-Riding participated in the interviews of the final two candidates Joe selected.  JA374:3-4.  One candidate, who was Asian, had a bachelor's degree in accounting, but had no work experience in an office setting and no professional experience in accounting.  JA374:6-9; JA656-59.  The other finalist, who was Hispanic, had an associate's degree and four years of relevant professional experience.  JA374:10-14; JA660-69.  Joe ultimately selected the Asian candidate.  JA374:5-6.  Smyth-Riding raised her concern that Joe did not select the most qualified candidate with Joe, Serino, and Castro.  JA375:5-11; JA525:1-3; JA670.  In response, Serino told Smyth-Riding "that's how it goes," and again advised her to be a team player.  JA385:18-22; JA386:2-4.

## D.    Inappropriate Interview Questions

Smyth-Riding spoke with members of management at least twice regarding the types of interview questions that are impermissible and potentially discriminatory.  During the selection process for the executive assistant/receptionist position, Smyth-Riding asked Serino to remind Lee not to ask candidates about race, religion or family.  JA392:22-JA393:5.  Although Serino originally refused to provide this guidance to Lee, Smyth-Riding later saw a note

to Lee on top of the applications advising him that Smyth-Riding wished to remind him not to ask questions about these topics.  JA393:13-16.

Several months later, shortly before her termination, Smyth-Riding received a complaint from an applicant for employment at SES.  JA553:3-18. The applicant told Smyth-Riding that Prasad asked her questions about her family obligations during an interview.  JA553:3-18.  Smyth-Riding informed Castro that Prasad's questions were inappropriate and made the candidate concerned about possible pregnancy discrimination.  JA134:24-JA135:4.  She also counseled management that questions about family status were not proper for an interview.  JA305:9-17.

## V.    Interactions Between Joe and Smyth-Riding

In her role as Director of Human Resources and member of SES's leadership team, JA686, Smyth-Riding interacted with Joe regarding various human resources topics.  These interactions were, at times, confrontational or unprofessional. JA126:22-23; JA127:2-3.  The first confrontation that Castro observed occurred during a staff meeting in which Smyth-Riding "raised some HR-related activities that [she] though were required of the company to do" and Joe objected.  JA127:6-12.

Castro observed that Joe, and not Smyth-Riding, instigated the issues between them.  JA128:16-23 ("So if I would say an instigator, I would say it was Daniel Joe.").  Smyth-Riding did not have a confrontational relationship with any

14

other SES employees.  JA130:19-23.  Castro counseled only Joe regarding the

unprofessional interactions.  JA130:24-JA134:7.  Similarly, Serino spoke with Joe

more than Smyth-Riding about the issues between Joe and Smyth-Riding.

JA195:4-8.

Serino addressed his concerns regarding their interactions with Castro and

Prasad.  JA198:25-JA199:1-2.  Serino may also have brought the issue to Lee's

attention.  JA200:1-5.

## VI.    Smyth-Riding's Performance

As Smyth-Riding's supervisor, Serino considered her "very competent."

JA170:16; JA174:21-23.  In a fall 2008 evaluation, Serino rated Smyth-Riding as

Consistently Exceeds Expectations—the highest rating available—in four of the

seven categories.  JA640; JA171:7-10.  Serino rated Smyth-Riding as Met and

Sometimes Exceeds Expectations in Communication, and Met Expectations in the

remaining two categories.  JA640.  In his narrative comments, Serino noted that

Smyth-Riding "deliver[ed] strong competence in the area of Human Resources

every day.  She [had] initiative, drive, and a very strong loyalty to the Company."

JA641.  Serino also stated that "the slope of [Smyth-Riding's] progress [was]

certainly positive."  JA641.

Castro also did not have any concerns about Smyth-Riding's performance.

JA137:23-JA138:1.  In contrast, Lee viewed Smyth-Riding's performance as good

initially, and then "very bad" in the last year of her employment.  JA265:22 ("She

was good and she became very bad."); JA265:24-25 ("Q. When did she become

very bad? A. I don't recall.  But in the probably past about one year of work.");

JA266:20-22 ("Q. Her performance was good in 2007.  In the summer of 2008 her

performance became very bad?  A. After one year, performance became very

bad.").

## VII.  2008 Christmas Party

In 2008, Smyth-Riding volunteered to plan the annual SES Christmas party.

JA407:17-19; JA136:19-20 ("[Smyth-Riding] had significant responsibility in

planning for [the party].").  In advance of the party, Smyth-Riding provided

detailed plans to Castro, Chief Operating Officer E.J. Sinclair, and co-worker

Stephanie Arnold.  JA642-44.  Smyth-Riding also informed management that she

would not be present at the party, as she would be serving as the Matron of Honor

at her best friend's wedding on the night of the party.  JA642; JA137:5-7; JA407:7-

10.  Smyth-Riding's husband attended the party in her place to ensure the event ran

smoothly.  JA642; JA408:4-16.  The party "was wonderful," JA136: at 24, and

several members of senior management told Smyth-Riding that it was a success.

JA409:17-20.

## VIII.  Costpoint, and 2008 Pay Raise and Bonus

In late December 2008, Lee ordered the removal of Smyth-Riding's access to Costpoint, a program used for accounting and human resources.  JA345:24-JA346:2; JA398:7-10; JA683.  Smyth-Riding used Costpoint "several times a week, if not daily" for her work.  JA398:11-15.  Smyth-Riding contacted Sinclair and Castro regarding the change in her access.  JA683.  In response, Sinclair told Smyth-Riding that there must be a mistake, and that he would address it after the first of the new year.  JA398:21-JA399:2.

Shortly after she lost access to Costpoint, an employee in payroll showed Smyth-Riding the lists of 2008 bonuses and salary increases for SES employees.  JA400:16-24.  Smyth-Riding learned that she was not receiving a bonus, and that she would receive a raise much smaller than those received by other employees.  JA400:14-15; JA401:10-14.  On January 9, 2009, Smyth-Riding received written confirmation that she would be receiving a salary increase of only 1.7 percent.  JA684.  At this time, the average increase was between 3 and 4 percent.  JA302:15-21.  According to Lee, who made the decision regarding bonuses and salary increases, JA402:3-4, an increase so small was effectively a decrease in Smyth-Riding's salary.  JA302:24-JA303:3.

## IX.    Termination and Replacement

### A.    January 6 and January 9, 2009 Meetings

On January 6, 2009, having learned that she would not be receiving a bonus and that her salary increase was going to be much smaller than those of other employees, and in light of her continued inability to access Costpoint, Smyth-Riding requested a meeting with Castro.  JA401:5-14.  The two met on January 9, 2009.  JA403:7-8.  During the meeting, Castro told Smyth-Riding that the issues she was experiencing were the result of her relationship with Joe.  JA402:5-8.  Smyth-Riding asked Castro if he viewed her as the antagonist in the relationship, and Castro assured Smyth-Riding that she was not.  JA402:9-14.  Smyth-Riding went on to raise her concerns regarding Serino's directions to her for hiring.  JA402:15-22.  She asked Castro to move her under his supervision because she was not comfortable with Serino's instructions to bring in young female applicants for the executive assistant/receptionist position.  JA402:15-22.  Castro told Smyth-Riding that he would think about her request.  JA402:23-JA403:2.

The following business day, January 12, 2009, Castro called Smyth-Riding in for a meeting with him and Serino.  JA403:10-15.  Castro began the meeting by telling Smyth-Riding that he was following up on their January 6, 2009 meeting.  JA403:16-18.  Castro then informed Smyth-Riding that she was fired.  JA403:16-19.  Serino assured Smyth-Riding that he and Castro did not want to fire her.

JA403:20-22.  He praised her business acumen, and told her that he had never met someone with her skill set and personality.  JA403:23-JA404:1.

### B.    Decision Maker

Although Castro and Serino informed Smyth-Riding of her termination, neither made the decision to fire Smyth-Riding.  JA126:6 ("Dr. Lee informed me to let her go."); JA172:19-20; JA172:24-25 ("I was not part of the final decision, or any decision, quite honestly.").  Both Castro and Serino also denied providing any input to the decision.  JA138:5-6; JA149:7-11; JA172:23-24.  They identified Lee as the sole decision maker.  JA126:6; JA172:22.  Despite signing the termination letter he presented to Smyth-Riding on January 12, 2009, JA646, Castro did not agree with the decision to fire Smyth-Riding.  JA126:7-12; JA138:24-JA139:1 ("I thought [Smyth-Riding] was a good employee.  I thought -- so I didn't, I didn't agree with the decision.  I was executing what I was asked to do.  But I did not agree with it.").

In contrast, Lee stated that the suggestion to fire Smyth-Riding "was brought up through management."  JA260:21-JA261:1.  According to Lee, Serino recommended firing Smyth-Riding.  JA262:20-21; JA264:12-14 ("Q. Is it your testimony that Dr. Serino recommended firing Terri Smyth-Riding? A. Yes.").

19

### C.    Reasons for Termination

In the termination letter that Castro signed but did not draft, JA138:19-20,

SES stated that it terminated Smyth-Riding's employment because her personality

no longer fit the needs of the company.  JA645-46.  When Castro asked Lee why

he was firing Smyth-Riding, Lee said "she doesn't fit in, something to that effect."

JA149:17.  Lee also pointed to the shift of the company's support operations to its

Alabama location.  JA150:13-15.

At the time of the termination, Lee did not share any reasons for the decision

with Serino.  JA173:1-2.  Over one year later, Serino drafted a memorandum

listing the "four contributing factors" for the decision to fire Smyth-Riding: 1) the

"shifting" of human resources needs to SES's Alabama location; 2) "anomalies" in

Smyth-Riding's time cards; 3) Smyth-Riding's "conflicts" with peers; and 4)

Smyth-Riding's failure to attend the 2008 Christmas party.  JA687-89.

After Smyth-Riding's termination, Lee provided several reasons for the

decision to fire Smyth-Riding.  The "key reason" was a reduction in the business in

SES's Maryland office.  JA271:4-5; JA272:20-22 ("So it's a decision of whether I

help her to continue business and continue employment, or terminate and save the

rest of the business.").  As a result, there was no need for the Director of Human

Resources position in Maryland.  JA289:1-19.  In addition to the reduction in

business, Lee relied on a report from Serino that Smyth-Riding was "cheating" on

20

her time cards when deciding to fire her. JA280:11-13; JA282:19-21; JA315:1-3. Smyth-Riding's performance and her absence from the 2008 Christmas party also played a role in Lee's decision to terminate her employment. JA281:18-22; JA287:16. Finally, information from Joe about Smyth-Riding's conflict with others, and attempts to agitate employees about their salaries were reasons for Lee's decision to fire her. JA280:11-13; JA283:14-16; JA292:17-21; JA293:11-18.

### D.    Replacement

SES did not have a plan in place for replacing Smyth-Riding immediately after her termination. JA647 ("Was there any discussion with Dr. Lee on what we'd do for HR?"). Within days, Lee decided to promote Boyett to oversee human resources for the entire company. JA647 ("[Boyett] (HR guy here) will run the HR for the entire company."); JA151:10-11 ("[T]he HR function was taken over by [Boyett]"); JA648 ("[A]s you need HR functions [Boyett] can come up and assist with recruiting, hiring, in processing, benefits, etc. This is similar to what [Smyth-Riding] did . . . .").

### SUMMARY OF THE ARGUMENT

The District Court erred when it granted Appellees' motion for judgment as a matter of law and prevented the jury from rendering a decision on Smyth-Riding's claims of retaliation and sex discrimination. Smyth-Riding introduced

sufficient evidence at trial to establish a *prima facie* case of retaliation, namely that she objected to SES's discriminatory employment practices; Lee, Joe and Richard Lee were aware of her protected activity; and the adverse actions occurred within a short period of time of her protected activity.  Smyth-Riding also introduced sufficient evidence to establish a *prima facie* case of sex discrimination because she is a women; she received a very favorable performance rating shortly before SES effectively decreased her pay and then terminated her employment; and SES replaced Smyth-Riding with a man.  Smyth-Riding further introduced evidence from which a reasonable jury could have found pretext—SES management officials offered conflicting testimony regarding the identity of the decision maker; SES and Lee offered multiple, shifting reasons for the decision to terminate Smyth-Riding's employment; and Lee offered testimony regarding Smyth-Riding's performance, the employee chosen to replace Smyth-Riding, and his knowledge of Smyth-Riding's protected activity that conflicted with his prior testimony, the documents introduced at trial, and the testimony of other management officials. Despite this evidence, the District Court concluded that Smyth-Riding did not meet her burden of proof, and dismissed all of her claims.

The District Court further erred by failing to view the evidence in the light most favorable to Smyth-Riding, and by drawing multiple inferences in favor of Appellees.   In its decision, the District Court drew inferences and made factual

determinations in favor of Appellees regarding Smyth-Riding's protected activity; the cause of Joe's conflicts with Smyth-Riding; Lee's knowledge of Smyth-Riding's protected activity; and the role of human resources at SES. The District Court also ignored Smyth-Riding's evidence of retaliation and sex discrimination that contradicted the inferences it drew in favor of Appellees, and improperly relied upon its own inferences in removing the decision from the jury and dismissing all of Smyth-Riding's claims.

## STANDARD OF REVIEW AND APPLICABLE LAW

The Court reviews awards of judgment as a matter of law under Federal Rule of Civil Procedure 50 *de novo*. *See Edelman v. Lynchburg College*, 300 F.3d 400, 404 (4th Cir. 2002).

In considering a motion for judgment as a matter of law, a court must view the evidence in the light most favorable to the non-moving party. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000); *Dennis v. Columbia Colleton Medical Center, Inc.*, 290 F.3d 639, 645 (4th Cir. 2002). The court must also draw all reasonable inferences in favor of the non-moving party, and may not weigh evidence or assess the credibility of witnesses. *See id.* Ultimately, judgment as a matter of law is appropriate only when "there can be but one reasonable conclusion as to the verdict." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

# ARGUMENT

## I.    A Jury Could Find Appellees Retaliated Against Smyth-Riding When Firing Her And Effectively Decreasing Her Salary.

The District Court's decision depended on two factual determinations—first, that Lee made the decisions regarding the challenged actions; and second, that Lee had no knowledge of Smyth-Riding's prior protected activity.  JA610:5-9; JA612:18-20.  Relying on these findings, the Court held Smyth-Riding could not establish causation between her protected activity and the adverse actions. JA613:16-20.  But the Court erred in making those factual findings.

The record contains evidence from which a jury could conclude that: (1) Lee did not make the decisions; (2) Lee was aware of Smyth-Riding's prior protected activity; or (3) Lee was influenced by the retaliatory animus of others when making the decisions.  The District Court made a detailed finding earlier on summary judgment regarding those very issues.  The evidence presented at trial did not change significantly from the evidence in the record on summary judgment. On the contrary, Lee was extensively impeached at trial.  The District Court wrote in its summary judgment decision:

> Smyth-Riding has also presented facts that Lee had knowledge of her protected activities when she was terminated.  During his deposition, Lee stated that Smyth-Riding "disrupt[ed] corporate business" and "wasted corporate resources" by speaking to employees and "telling them privately that – [] [the] company [was] mistreating them, mishandling their compensation, and so on."  Lee also stated that Smyth-Riding was battling with Joe about how the company treated employees, that Joe told him about

24

these incidents, and Smyth-Riding was trying to "stir[] up" her own case or lawsuit.  Lee admitted that "disrupting corporate business" was one of the reasons Smyth-Riding was terminated.  Thus, Smyth-Riding has produced sufficient facts for a jury to conclude that Lee had knowledge of the protected activity.

JA55 (internal citations omitted).  Smyth-Riding went on to present additional

evidence in support of causation at trial.

### A. Smyth-Riding Engaged in Protected Activity and Appellees Subjected Her to Adverse Employment Actions when They Fired Her and Effectively Decreased Her Salary.

The District Court focused on the issue of causation in its finding on Smyth-

Riding's retaliation claims.  The District Court did not articulate a ruling

regarding[1] whether Smyth-Riding participated in protected activity and whether

she was subjected to an adverse employment action.  Title VII and Section 1981

prohibit employers from retaliating against an employee who participated in

protected activity.  The analytical framework applied to Section 1981 claims is the

same as that applied to Title VII claims.  *See Holland v. Wash. Homes, Inc.*, 487

F.3d 208, 218 (4th Cir. 2007) (describing Title VII elements); *Pulley v. KPMG*

---

[1] The District Court appeared to question whether Smyth-Riding had a good faith, reasonable belief for her protected activity.  JA582:12-15 ("I mean, they can hire . . . a college graduate from University of Maryland with potential.  I mean, nobody's going to object to that.  I mean . . . you just can't do it, not at all."); JA584:2-6 ("The Court: So what discrimination allegations?  Ms. Dave: That Zakia Harris was fired, at least had the appearance of discrimination.  That Mabel Ng was hired. The Court: Yeah, but there's a difference between appearance and reality."); JA610:24-JA611:2 ("And the same thing . . . with the employee who, compared to another employee doing a similar job, she was a probationary employee.  It's perfectly clear that her year was up and they let her go.").

*Consulting, Inc.*, 348 F. Supp. 2d 388, 396 (D. Md. 2004), *aff'd* 183 F. Appx 387 (4th Cir. 2006) (describing Section 1981 elements).

To establish her claims of retaliation, Smyth-Riding must show: (1) she engaged in protected activity, (2) Appellees took an adverse employment action against her, and (3) there was a causal link between the protected activity and the adverse employment action. *Laughlin v. Metropolitan Wash. Airports Auth.*, 149 F.3d 253, 258 (4th Cir. 1998) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973)).  Once established, the burden of production shifts to Appellees to rebut the presumption of retaliation by articulating legitimate, non-retaliatory reasons for its actions.  Smyth-Riding bears the ultimate burden of demonstrating that the articulated reasons were pretext for retaliation. *Id.* (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-11 (1993); *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981)).

Smyth-Riding engaged in protected activity numerous times when she protested Appellees' discriminatory employment practices. *See supra* Statement of Facts Part IV (citing, for example, JA135:5-10; JA136:3-9; JA145:22-146:1; JA372:8-11; JA375:5-11; JA382:8-14; JA525:1-3).  Protected activity falls into two categories—opposition or participation. *EEOC v. Navy Federal Credit Union*, 424 F.3d 397, 406 (4th Cir. 2005), *cert. denied*, 547 U.S. 1041 (2006). "Opposition" protected activity includes circumstances in which an employee

expressed disapproval of discriminatory practices in the workplace. *See Laughlin*, 149 F.3d at 259. This category includes "complain[ing] to [] superiors about suspected violations…." *See Bryant v. Aiken Reg'l Med. Ctrs., Inc.*, 333 F.3d 536, 543-44 (4th Cir. 2003). Smyth-Riding's protected activity was "opposition" because she expressed concerns to Appellees' managers about discriminatory employment practices.

Firing and effectively decreasing Smyth-Riding's pay were materially adverse actions. Employees "must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker" from engaging in protected activity. *See Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotations and citations omitted). Termination of employment is indisputably adverse. *See*, *e.g.*, *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375-76 (4th Cir. 2004); *Page v. Bolger*, 645 F.2d 227, 233 (4th Cir. 1981). Effectively lowering an employee's salary would also chill an employee's likelihood of engaging protected activity. *Cf. Burlington*, 548 U.S. at 71-73 (finding that a loss of pay that the employer subsequently repaid was sufficiently materially adverse to chill an employee's protected activity).

Lee testified that Smyth-Riding's pay raise of 1.7 percent was a terrible pay raise, because the average raise at the time was three or four percent. *See*, *e.g.*,

27

JA400:14-24; JA401:10-14; JA684.  He further explained that, given inflation, the raise was effectively a salary *decrease*.  JA302:24-JA303:3; JA402:3-4.  This decrease in Smyth-Riding's pay and her subsequent termination are sufficient to establish the first two elements of retaliation and the remaining question is whether a jury could find Appellees were motivated by retaliatory animus.

### B. Smyth-Riding Presented Evidence from which a Jury Could Find Causation.

Appellees' shifting and implausible explanations of the reasons for Smyth-Riding's termination, finger-pointing amongst managers regarding who made the decision to terminate Smyth-Riding, and the temporal proximity between Smyth-Riding's protected activity and actions at issue are sufficient to establish causation. To establish causation, an employee may show the employer's explanation "was 'unworthy of credence,' and therefore a 'coverup' for unlawful discrimination." *See Lauer v. Schewel Furniture Co., Inc.*, 84 F. App'x 323, 329-30 (4th Cir. 2004) (quoting *Burdine*, 450 U.S. at 256; *McDonnell Douglas*, 411 U.S. at 805).

In 2014, the Supreme Court explained the causation requirements in retaliation cases.  *See Burrage v. United States*, 134 S. Ct. 881 (2014).  *Burrage* clarified the Court's decision in *Univ. of Teas. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517 (2013), which required but-for causation in retaliation cases.  Justice Scalia, writing for a unanimous Court, explained that but-for causation includes those

28

circumstances in which the factor at issue "was the straw that broke the camel's back." *Burrage*, 134 S. Ct. at 888.

Referencing employment discrimination cases, Justice Scalia wrote that 42 U.S.C. § 2000e-3(a) required "proof that the desire to retaliate was [a] but-for cause of the challenged employment action." 134 S. Ct. at 889 (bracketed text in original) (citing *Nassar*, 133 S. Ct. at 2517)). The Court's use of "a" rather than "the" is telling. *But see Arthur v. Pet Dairy*, 593 Fed. Appx. 211, n. 9 (4th Cir. 2015). Employees need not establish that retaliatory animus was the sole reason for the adverse action at issue. Of course, this retaliatory reason must still satisfy but-for causation.

*Nassar* did not impose a heightened causation standard. *Foster v. Univ. of Maryland-Eastern Shore*, 787 F.3d 243, 252 (4th Cir. 2015). Retaliation may not have been a mere motivating factor; it must have been "the real reason" for the materially adverse action, a factor *without which the adverse action would not have occurred*. *Id.* Thus, the question here is whether a jury could conclude that Appellees would have taken the challenged actions even if Smyth-Riding had not engaged in protected activity.

### 1. Smyth-Riding participated in protected activity immediately prior to the "terrible" raise and the termination of her employment.

Temporal proximity between the adverse action at issue and the protected activity may establish causation. *See Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001); *Foster*, 787 F.3d at 253 (citing *King v. Rumsfeld*, 328 F.3d 145, 151 & n. 5 (4th Cir. 2003)). Appellees effectively reduced Smyth-Riding's pay and then fired her in January 2009. *See supra* Statement of Facts Parts VIII, IX (citing JA400:14-24; JA401:10-14; JA403:10-22; JA684). Smyth-Riding expressed her concerns to Serino about Joe's preference for an Asian applicant over a Hispanic applicant in November 2008, and raised concerns about SES's compliance with Title VII in writing on October 22-23, 2008. *See*, *e.g.*, JA375:5-11; JA385:18-22; JA386:2-4; JA670. Smyth-Riding also engaged in protected activity on January 9, 2009, when she expressed her concerns about Serino's direction to only consider young women for the executive assistant/receptionist position. JA402:15-22. Castro and Serino presented the termination letter to her the following business day—January 12. JA645-46. This short time period between the protected activity and the challenged actions "tends to show causation[.]" *See Foster*, 787 F.3d at 253.

### 2. Appellees' implausible and contradictory articulated reasons are evidence of causation.

The inconsistent testimony regarding who made the decisions, and the reasons for the actions, demonstrates that management was grasping at straws, manufacturing post-hoc explanations, and using a scattershot approach with the hope that at least one explanation would seem plausible. The jury could conclude that the shifting explanations and finger-pointing were pretext for retaliation. *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981); *see also Lauer*, 84 F. App'x at 329-30.

### a. A jury could infer that retaliatory animus motivated Appellees to fire Smyth-Riding.

Where a plaintiff "rendered the employer's reason so questionable as to raise an inference of deceit[,]" a reasonable jury could conclude that the employer's actual reason for firing the plaintiff was retaliatory animus. *See Foster*, 787 F.3d at 254. Appellees' explanation(s) for firing Smyth-Riding strain credulity. In addition, SES management officials contradicted one another regarding who decided to fire Smyth-Riding and gave conflicting testimony regarding the reason(s) for firing her. While Serino and Castro both disclaimed any role in the decision to fire Smyth-Riding, JA138:5-6; JA149:7-11; JA172:23-24, Lee testified that Serino suggested firing Smyth-Riding, and that the decision came up through Serino and Castro, JA260:21-JA261:1; JA262:20-21; JA264:12-14.

The letter firing Smyth-Riding also contradicted the testimony.  The letter contained the following explanation:  "SES[] no longer feels [Smyth-Riding's] personality fits with what is needed for this company and no longer feels it is in its best interests to continue [her] employment."  JA645-46.  It provided no other reason for Smyth-Riding's termination.

In contrast, Lee testified to wildly different reasons for firing Smyth-Riding. At times, he testified that he fired her due to the supposed reduction in workload and revenue in Maryland.  At trial, Lee alleged for the first time that he had to fire Smyth-Riding "to save the rest of the business."  JA271:4-5; JA272:20-22 ("So it's a decision of whether I help her to continue business and continue employment, or terminate [her] and save the rest of the business.").  When asked for the primary reason Lee fired Smyth-Riding, he testified that "her role in SES[] Maryland division as a human resources disappeared."  JA288:5-12.

This reason appears unlikely as Smyth-Riding had always been in charge of Human Resources for the entire company, and SES did not ask her to relocate.  *See supra* Statement of Facts Part II (citing JA279:2-5; JA351:1-3; JA357:22-24); *see also* JA181:18-21.  Appellees also did not characterize Smyth-Riding's termination as a layoff, which would have been more consistent with the purported disappearance of her position.  JA288:13-16.  Furthermore, Castro testified that the Director of Human Resources position could be performed from "anywhere."  JA153:5-11.

Lee gave other reasons, including reasons wholly unrelated to business changes. He testified that Smyth-Riding did make not a single positive contribution to SES throughout her tenure, and had "very bad" performance during her last year of employment. JA281:17-282:8; JA265:25; JA266:20-22. A jury could reasonably conclude that Lee was not credible when he claimed he fired Smyth-Riding due to performance when Serino, Smyth-Riding's supervisor, gave her a positive performance evaluation at the same time she received the "terrible" raise and Appellees decided to fire her. JA171:7-10; JA640-41. Serino testified that he considered Smyth-Riding "very competent" and rated her performance very highly. JA170:15; JA174:21-23; JA640. Castro also had a positive opinion of Smyth-Riding's performance. JA137:23-JA138:1.

Despite Lee's purported concerns with Smyth-Riding's performance, he failed to address this poor performance with Smyth-Riding, and did not direct her supervisor to address performance with her. JA268:16-270:21. During the trial, Lee attempted to discount the meaning of Smyth-Riding's positive performance evaluation in December 2008, claiming that the category "meets expectation" actually meant she was not performing well. JA269:3-270:18.

Lee's testimony about the timing of Smyth-Riding's performance decline is further evidence of retaliatory animus since her performance supposedly became "very bad" in the summer of 2008. JA265:25; JA266:20-22. The summer of 2008

was the very same time Smyth-Riding protested the instruction to hire a "hot chick" for the receptionist position, and shortly after she raised concerns that Joe's termination of Harris was the result of discrimination. *See supra* Statement of Facts Part IV.B; JA670; JA363:2-15. Lee testified that as "the owner, president, and chairman" of SES, he was aware of matters such as the performance of employees. JA265:16. In light of this, and the involvement of two senior managers, Lee's son Richard, and SES's outside counsel, JA362:2-4; JA364:8-9; JA655; JA670, a reasonable jury could infer that Lee was aware of Smyth-Riding's protests regarding Joe's termination of Harris in April 2008, shortly before the alleged drop in Smyth-Riding's performance. A jury should have the opportunity to determine whether the supposed performance issues were pretext for retaliation.

A jury could also infer that Lee's reliance on Smyth-Riding's conflict with Joe when deciding to fire her was evidence of retaliatory animus. Lee explained that one of the reasons he terminated her was because she battled with Joe about employees' salary and bonuses. *See* JA311:20-313:25; JA846:7-21. Smyth-Riding's "battle" with Joe was protected activity in which Smyth-Riding told Joe her concerns that he was engaging in discriminatory hiring and firing practices. *See*, *e.g.*, JA670.

Lee's descriptions of his reasons for firing Smyth-Riding also sound like descriptions of protected activity. Lee testified Smyth-Riding had disturbed the

company and disrupted corporate business by "agitating some of the employees with their employment situation[.]"  *See*, *e.g.*, JA280:11-13; JA283:14-16; JA292:17-21; JA293:11-18.  He explained that Joe informed him that Smyth-Riding was approaching employees to get them riled up.  JA292:8-293:22.  But Lee could not identify any particular employees, and testified that he could not recall his conversations with Joe.  JA285:14-JA287:4.  A jury could reasonably conclude that Joe told Lee about Smyth-Riding's protected activity.  The jury should have had the opportunity to conclude whether Appellees' shifting and implausible explanations for firing Smyth-Riding were evidence of retaliation.

A jury should have the opportunity to make credibility findings regarding the contradictory testimony of the management witnesses involved and draw its own inferences regarding who made the decision, whether the reason(s) for firing Smyth-Riding was plausible, or whether retaliatory animus ultimately motivated the decision.

> **b.    Appellees failed to articulate a legitimate reason for effectively decreasing Smyth-Riding's salary.**

The jury could also conclude that Appellees retaliated against Smyth-Riding by issuing her a "terrible" pay raise.  Throughout litigation, the only proffer Appellees have made regarding the reason for Smyth-Riding's "terrible" raise was that she was not performing well.  JA40.  But the record contains no evidence that Smyth-Riding was performing poorly, beyond Lee's unsubstantiated testimony.

On the contrary, as explained in further detail above, her supervisor testified that she was performing well and issued her a positive performance evaluation during the same time period that Appellees effectively decreased her salary. *See supra* Statement of Facts Parts VI; I.B.2.a. Castro confirmed this positive opinion of Smyth-Riding's performance as HR Director and expressed his disagreement with the decision to fire her. *See* JA124:16-JA125:6; JA125:20-126:12; JA138:11-JA139:1.

The District Court included no analysis of the pay raise issue and should have permitted the jury to reach its own factual conclusions regarding Smyth-Riding's performance and Appellees' reason for effectively decreasing her pay.[2]

3. **The Record also Demonstrates Causation Through the "Cat's Paw" Theory Articulated by the Supreme Court in *Staub v. Proctor Hospital*.**

The District Court erred when it failed to consider whether Smyth-Riding established "cat's paw" causation. Smyth-Riding introduced evidence that demonstrates that even if Lee was the "ultimate decision maker" on the adverse

---

[2] The District Court also appeared to misunderstand the law regarding the adversity of the effective pay decrease, asking:

> The Court: I'm sorry. Can't you decrease somebody's salary in this world anymore?
> Ms. Dave: I'm sorry?
> The Court: Is it against the law to decrease somebody's salary? I mean, I don't get that.
> Ms. Dave: Well, that merely goes to the fact that it was sufficiently adverse …

JA594:14-21.

actions, and even if he did not have knowledge of her protected activity, Joe's or Richard Lee's retaliatory animus was the proximate cause of the actions. The Supreme Court recognized the "cat's paw" theory of liability in a Uniformed Services Employment and Reemployment Rights Act and the Fourth Circuit has applied it in Title VII cases. *Staub v. Proctor Hospital*, 131 S. Ct. 1186 (2011); *Young v. United Parcel Serv., Inc.*, 707 F.3d 437, 449 (4th Cir. 2013) (distinguishing the facts in that case from *Staub* because the plaintiff presented no evidence that the manager who held animus "sought to influence" a decision-maker). Appellees misstated the law during the Rule 50 argument, and the District Court erred by failing to identify which standard it applied.[3] JA601:10-603:13.

A jury could reasonably conclude that Joe or Richard Lee's retaliatory animus was the proximate cause of Lee's decisions to fire Smyth-Riding and effectively decrease her salary. As the Supreme Court has explained, the proximate cause element is not demanding, "requir[ing] only some direct relation between the injury asserted and the injurious conduct alleged[.]" *See Staub*, 131 S. Ct. at 1192, 1194 (quoting *Hemi Group, LLC v. City of New York*, 559 U.S. 1, 9

---

[3] Appellees informed the District Court that the relevant case was *Hill v. Lockheed Martin Logistics Mgmt.* 354 F.3d 277 (4th Cir. 2004). But the Supreme Court clarified the "cat's paw" standard six years later in *Staub v. Proctor Hospital*, 562 U.S. 411, 131 S. Ct. 1186, 179 L. Ed. 2d 144 (2011). This Court has since applied the "proximate cause" standard articulated in *Staub*. *Brown v. Nucor Corp.*, 785 F.3d 895, 947 (4th Cir. 2015); *Young v. United Parcel Serv.*, 707 F.3d 437, 449 (4th Cir. 2013).

(2010)) (internal quotations omitted).  The record contains sufficient evidence from which a jury could conclude that Joe's or Richard Lee's retaliatory animus was the "proximate cause" of Smyth-Riding's termination of employment and "terrible" raise.

The District Court appeared to acknowledge that Richard Lee's animus may have influenced Lee, but nevertheless declined to hold as such.  The District Court explained, "I am certainly willing to infer that Dr. Lee was told by his son, who didn't like the fact that we know … that [] Smyth-Riding was helping prevent or was standing in the way between hiring attractive, young women whom he could hit on."  JA610:5-14.

The record also contains evidence from which a jury could conclude that if Lee was the decision-maker, Joe's retaliatory animus poisoned his decisions.  *See*, *e.g.*, JA612:20-JA613:2 ("[I]f he perceived a management conflict between Mr. Joe, who had been with him a long time … and the head of Human Resources, it was within his bailiwick….  He could say things are just getting out of control.  And I'm siding with Mr. Joe, and it's not because she's engaged in Title VII activities.").

The District Court held that "the only reasonable inference" the jury could draw from the interactions between Joe and Smyth-Riding was that Joe "was ticked off because Ms. Smyth-Riding was trying to run his department."

JA603:23-25.  There is no evidence in the record, however, that Smyth-Riding was trying to run Joe's department.  Instead, there is a specific reference to discrimination in an email from Smyth-Riding to Joe.  JA670.  Following that email, Joe engages in a lengthy email rant against Smyth-Riding and copies senior management—Castro and Serino.  Despite the abundant testimony that Smyth-Riding had raised concerns about Joe's discriminatory employment practices, the District Court erred by viewing her conflict with Joe as merely a "management conflict[.]"  JA14-17; *see also* JA603:20-21 ("The Court: Wait.  Where is the evidence that Mr. Joe's confrontations stem from concerns about discrimination?")

The District Court's factual inferences are further belied because the record contains abundant evidence that Smyth-Riding was *supposed* to be involved in hiring and firing decisions.  JA159:14-JA160:15; JA179:1-24.  Moreover, the District Court reached the opposite conclusions on summary judgment—holding the fact-finder *could* infer Joe told Lee about Smyth-Riding's protected activity. *See* JA55.  Given Lee's knowledge of Joe's frustration with Smyth-Riding, and Joe's undisputed fury with Smyth-Riding due to her protected activity, a jury could conclude that Joe's retaliatory animus was the proximate cause of Lee's decision to effectively decrease Smyth-Riding's pay and end her employment.

39

## II.    The District Court Erred When It Granted SES's Rule 50 Motion On Smyth-Riding's Sex Discrimination Claim Without Explanation.

The District Court provided virtually no explanation or analysis of its decision on Smyth-Riding's sex discrimination.  *See* JA594:1-JA597:14; JA599:20-JA600:19.  The record contains sufficient evidence from which a jury could conclude that SES discriminated against Smyth-Riding on the basis of her sex when ending her employment.  Smyth-Riding established a *prima facie* case of discriminatory discharge.  She is female, SES fired her, and SES replaced her with two successive male employees.  As articulated in detail above, SES failed to articulate a legitimate reason for firing Smyth-Riding.  The jury could conclude from the evidence presented that SES were ultimately motivated by discrimination to fire Smyth-Riding.

To establish a prima facie case of discriminatory discharge, Smyth-Riding must show (1) she is a member of a protected class, (2) SES fired her, (3) she was meeting SES's expectations, and (4) her position remained open or she was replaced by someone outside her protected class.  *See Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir. 2004).  But the *prima facie* case requirements are "not necessarily applicable in every respect to differing factual situations."  *McDonnell Douglas Corp*, 411 U.S. at 802, n. 13; *see also Miles v. EEOC*, 429 F.3d 480, 488-89 (4th Cir. 2005) (determining the fourth element

40

would not apply in cases in which an employer hired an individual from the protected class to disguise the discrimination).

In the alternative, Smyth-Riding may establish discrimination by presenting evidence of a "mixed motive." *Hill*, 354 F.3d at 285 (citing *Desert Palace Inc. v Costa*, 539 U.S. 90 (2003)). She "need not demonstrate that the prohibited characteristic was the sole motivating factor to prevail, so long as it was a motivating factor…. [I]t is sufficient for the individual to demonstrate that the employer was motivated to take the adverse employment action by both permissible and forbidden reasons." *Hill*, 354 F.3d at 284 (citing 42 U.S.C.A. § 2000e-2(m)); *Price Waterhouse v. Hopkins*, 490 U.S. 228, 241 (1989)).

### A.    Smyth-Riding Established a *Prima Facie* Case of Discriminatory Discharge.

There is no question that Smyth-Riding can meet the burden of proving that she is a member of a protected class, and that she suffered an adverse action. During the trial, Smyth-Riding presented evidence that she was meeting the expectations of her employer.  JA170:16; JA640.  She also introduced sufficient evidence to establish that she was replaced by someone outside of her protected class.

After SES fired Smyth-Riding, it promoted Boyett, a male employee in Huntsville, Alabama, into her position.  *See*, *e.g.*, JA154:9-12.  SES did not have a plan in place for replacing Smyth-Riding immediately after her termination.

41

JA647 ("Was there any discussion with Dr. Lee on what we'd do for HR?").

Within days, Boyett began overseeing Human Resources for the entire company.

JA647 ("[Boyett] (HR guy here) will run the HR for the entire company.");

JA151:10-11 ("[T]he HR function was taken over by [Boyett]"); JA648 ("[A]s you

need HR functions [Boyett] can come up and assist with recruiting, hiring, in

processing, benefits, etc.  This is similar to what [Smyth-Riding] did . . . .").  Lee

contradicted his senior managers and testified that Boyett did not replace Smyth-

Riding.  JA275:10-15.  A jury should have the opportunity to assess the credibility

of these witnesses and draw their own inferences from the testimony.

    In the alternative, if the Court finds that SES did not fill Smyth-Riding's

position and it did not remain open, the Court should find that Smyth-Riding is not

required to meet the fourth prong of the *prima facie* case for discriminatory

discharge.  "This court's requirement that Title VII plaintiffs show replacement

outside the protected class as part of their prima facie case is *not* dictated by

Supreme Court precedent."  *Miles*, 429 F.3d at 485 (emphasis added).  "The

method suggested in *McDonnell Douglas* [*Corp. v. Green*, 411 U.S. 792, (1973)]. .

. was never intended to be rigid, mechanized, or ritualistic."  *Furnco Constr. Corp.

v. Waters*, 438 U.S. 567, 577 (1978).  The Court has explicitly held that a plaintiff

in a Title VII case "is not required as a matter of law to point to a similarly situated

white comparator in order to succeed on a race discrimination claim."  *Bryant v.*

42

*Aiken Reg'l Med. Ctrs. Inc.*, 333 F.3d 536, 545 (4th Cir. 2003) (citing *Dennis*, 290 at 648–49 n. 4). In *Miles*, the Court considered exceptions to the fourth prong of the *prima facie* case for discriminatory discharge claims. 429 F.3d at 483. In its decision in *Miles*, the Court recognized that the fourth prong of the *prima facie* case would not be applicable where the defendant acts "to disguise its act of discrimination toward the plaintiff." *Id.* at 488 (quoting *Brown v. McLean*, 159 F.3d 898, 905-06 (4th Cir. 1998)).

Here, in the event the Court finds Smyth-Riding's position remained open or SES did not replace her with an individual outside her protected class, a jury could nevertheless conclude that SES acted to disguise its discrimination toward Smyth-Riding. *See id.* The jury could conclude that while Boyett did not immediately assume Smyth-Riding's job title, he began performing her duties.

Further, there is no evidence that at the time of SES fired Smyth-Riding, the SES managers believed her job had been eliminated. Rather, there is evidence that when she was fired, SES had no plans for the transfer of her responsibilities. Emails sent after her termination demonstrated that SES managers instead discussed its plans for Human Resources *after* firing Smyth-Riding. JA647.

Given SES's failure to plan for the transfer of Smyth-Riding's responsibilities until after her termination, a jury could conclude that Appellees' alleged decision to eliminate Smyth-Riding's position was an act to disguise

43

discrimination.  The "fourth prong" of the *prima facie* case for discriminatory

discharge does not apply.  *See Miles*, 429 F.3d at 488.

### B.    The Same Actor Inference does not Apply to Smyth-Riding's Termination.

The principle that when the same person hires an employee and

subsequently fires that same employee, there is a "powerful inference" that the

termination was not discriminatory is inapplicable in the instant matter.  The Court

articulated the principle in *Proud v. Stone*, 945 F.2d 796 (4th Cir. 1991).  In *Proud*,

the Court held that the same-actor inference applies "in cases where the hirer and

firer are the same individual and the termination of employment *occurs within a*

*relatively short time span following the hiring*…"  *Id.* at 797-98 (emphasis added)

(applying the inference where the plaintiff was fired six months after his

employment began).  Here, Appellees fired Smyth-Riding after approximately one

and a half years of employment, which is not a "relatively short time span."  *See id.*

at 797.  The same-actor inference articulated in *Proud* does not apply in the instant

matter.[4]

---

[4] The Sixth Circuit has held that the minimization of the same-actor inference "is more consistent with the requirement that, in considering a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in favor of the nonmoving party."  *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 573 (6th Cir. 2003) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

**III.    The District Court Applied the Wrong Standard of Law When Considering Defendants' Motion for Judgment as a Matter of Law.**

In considering Defendants' motion for judgment as a matter of law, the District Court applied incorrect legal standards to Smyth-Riding's claims of discrimination and retaliation.

**A.    The District Court Improperly Made Factual Determinations and Drew Inferences in Favor of Appellees.**

The District Court's grant of the motion for judgment as a matter of law was improper because the Court improperly drew multiple inferences in favor of Appellees, and failed to view the evidence in the light most favorable to Smyth-Riding.  In considering a motion for judgment as a matter of law, a court must view the evidence in the light most favorable to the non-moving party.  *See Dennis v. Columbia Colleton Medical Center, Inc.*, 290 F.3d 639, 645 (4th Cir. 2002). The court must also draw all reasonable inferences in favor of the non-moving party, and may not weigh evidence or assess the credibility of witnesses.  *See id.* In granting the Rule 50 motion, the District Court drew multiple inferences in favor of Appellees.

**1.    Joe's termination of Harris and hiring of Ng**

Smyth-Riding presented evidence that she had a reasonable, good-faith belief that Joe discriminated on the basis of race in firing Harris and hiring Ng. Smyth-Riding testified that Joe offered several reasons for his decision to fire

Harris, all of which she easily rebutted. *See supra* Statement of Facts Part IV.C.

Joe's shifting reasons, which did not appear legitimate to Smyth-Riding, caused

her to be concerned about his decision to terminate Harris. *See id.* In discussing

this event, and Smyth-Riding's report of possible discrimination, the District Court

was dismissive of Smyth-Riding's concerns, and found that Joe terminated Harris

because her probationary period was over. JA584:2-6 ("The Court: So what

discrimination allegations? Ms. Dave: That Zakia Harris was fired, at least had the

appearance of discrimination. That Mabel Ng was hired. The Court: Yeah, but

there's a difference between appearance and reality." ); JA610:24-JA611:2 ("And

the same thing . . . with the employee who, compared to another employee doing a

similar job, she was a probationary employee. *It's perfectly clear that her year*

*was up and they let her go*.") (emphasis added).

The District Court was similarly dismissive of the evidence of possible

discrimination in the hiring of Ng. As Smyth-Riding testified, although Ng had a

degree in accounting, she had no relevant experience, and her only prior work

experience was in a restaurant. JA374:6-9; JA656-59. In contrast, the other

finalist had four years of relevant experience and an associate's degree. *See*

JA374:10-14; JA660-69. The District Court concluded that Smyth-Riding "was

totally off the reservation" in her concerns of possible race discrimination.

JA586:5-7. In the District Court's view, the choice between candidates was

46

obvious, as Ng "was clearly qualified and had potential." JA591:11-12; JA586:5-

12 ("I mean, *I would hire somebody*, if somebody is hired for 33, $36,000 position

who had . . . graduated from the University of Maryland and then done what she

had done at College Park, as opposed to an Associate's degree at Anne Arundel

County . . . that's a perfectly legitimate business decision.") (emphasis added).

### 2.    Conflict between Joe and Smyth-Riding

Smyth-Riding presented evidence during the trial regarding her relationship

with Joe. As Castro testified, Joe was the instigator of the conflicts between them.

*See* JA128:16-23. The evidence also supported an inference that the issues

between Joe and Smyth-Riding centered on Smyth-Riding's concerns about Joe's

employment practices. JA127:6-12; JA670; JA536:13-21 JA367:10-16; JA372: 8-

11. These practices included Joe's decision to offer an increased salary to an Asian

candidate who had no relevant experience. JA670. Smyth-Riding also introduced

testimony that Joe reported to Lee that Smyth-Riding was agitating employees

regarding their salaries. JA158:17-21; JA159:11-16.

Despite this evidence, the District Court concluded that the dispute between

Joe and Smyth-Riding was simply a "management conflict" and that "the only

reasonable inference is that [Joe] was ticked off because Ms. Smyth-Riding was

trying to run his department." JA603:20-25; JA610:14-17 ("The situation with Mr.

Joe . . . was a . . . management conflict, which upper management's got to

47

decide.").  The District Court also declined to infer that Joe held any animus

towards Smyth-Riding as a result of her protected activity, or that he told Lee that

Smyth-Riding was raising concerns of discrimination.  JA582:2-6 ("[I]f Dr. Lee

made the decision and what was being presented to him by his son and by Mr. Joe

was that Ms. Smyth-Riding was riling people up and was a troublesome employee,

that is quite different from knowing there was discrimination occurring.");

JA598:23-JA599:4 ("But as the President of the company . . .  Joe telling you that

she is out there riling up people about pay, which is not discrimination.  I mean, I

say it can be discrimination, but it's not by itself.  This could have very well led

Dr. Lee to the conclusion that Ms. Smyth-Riding is just not fitting in."); JA606:8-

13 ("If you're paid less than somebody else because of your gender or because

[sic] your race or because of your age, that is a factor.  But we do not live in Bernie

Sanders' world where riling people up about salaries in any way relates to Title VII

or any other anti-discrimination law."); JA608:18-23 ("You know, if I'm Dr. Lee,

what I know is . . . Mr. Joe, in whom I have confidence, is telling me that she's

sticking her nose into things and trying to make decisions on things that . . . aren't

within her bailiwick."); JA612:20-JA613:2 ("Dr. Lee, if he perceived a

management conflict between Mr. Joe, who had been with him a long time . . . and

the head of Human Resources, it was within his bailiwick.  He was the decision

maker.  He could say things are just getting out of control.  And I'm siding with

Mr. Joe, and it's not because she's engaged in Title VII activities.  But I can't accept this.").

### 3. Lee's knowledge of Smyth-Riding's protected activity

Smyth-Riding produced sufficient evidence to create an inference that Lee was aware of her objections to SES's discriminatory employment practices. Smyth-Riding testified that Serino shared Smyth-Riding's instructions regarding proper interview questions with Lee.  JA392:22-JA393:16.  Lee testified that he was aware that Smyth-Riding counseled management about interview questions that could be discriminatory after Prasad asked a candidate about her family status. JA305:9-17.  Two members of management, SES's attorneys, and Lee's son were all aware of Smyth-Riding's concerns that Joe's decision to fire Harris was discriminatory.  JA364:2-9; JA655; JA670.  Smyth-Riding also presented evidence that multiple instances of her protected activity occurred around the time that Lee, who was no longer her supervisor, believed her performance became "very bad." *See* JA363:2-15; JA364:2-4; JA364:8-9; JA372:8-11; JA372:18-21; JA266:20-22; JA596:13-17.

The District Court failed to draw any reasonable inferences in favor of Smyth-Riding based on this evidence, and instead concluded that there was no evidence Lee had any knowledge of Smyth-Riding's oppositional activity. JA583:18-22 ("There has to be evidence that [Lee] knew when he, I would think

that he knew, if he was the decision maker, and I think the evidence was clear that . . . your client says that she never told him."); ("I don't know where the evidence is that he knew about Ms. Smyth-Riding's complaint, or that there was a good faith basis for Ms. Smyth-Riding's complaint.").  The District Court also rejected the possibility that the jury could find Lee was aware because his denials of knowledge lacked credibility:

> Ms. Dave:  Your Honor, the jury could conclude that Dr. Lee was not credible given the numerous inconsistencies between his testimony here and his testimony at deposition.
>
> The Court:  So suppose they find him not credible?  What do you want to infer?  That he was not the decisionmaker [sic]?
>
> Ms. Dave:  No.  That he was aware of the allegations of discrimination . . . .
>
> The Court:  But there has to be evidence.  You can't -- there has to be some evidence that he was aware . . . .

JA607:5-13.  Rather than apply the appropriate standard and draw inferences in favor of Smyth-Riding, the District Court improperly sought direct evidence of discrimination.  *See Hill*, 354 F.3d at 284 (4th Cir. 2004) (stating that a plaintiff may prove a claim of discrimination through circumstantial evidence).

### 4.    The role of human resources

In repeatedly drawing inferences in favor of SES and Lee, the District Court injected its judgment on the proper role of human resources professionals.  Although Smyth-Riding introduced evidence that as the Director of Human

Resources, she was to be involved in all hiring and firing decisions, JA179:1-3, and that Joe did not have the authority to fire Harris or offer a position to Ng without Smyth-Riding's involvement, JA672, the District Court concluded otherwise. JA597:7-9 ("A Human Relations Director . . . doesn't hire people in operational positions. That's just not the way the world works."); JA610:18-23 ("And the fact of the matter is . . . that Mr. Joe [was] perfectly entitled to hire within his operations department whom he wanted to hire. It's not the job of the Human Relations Director to hire people. It's the job of the manager of that department.").

### B. The District Court improperly ignored the circumstantial evidence of discrimination and retaliation.

It is evident from the District Court's decision that it ignored the circumstantial evidence of both sex discrimination and retaliation.

#### 1. The District Court improperly ignored the evidence of sex discrimination.

As discussed in more detail above, Smyth-Riding presented evidence that established a *prima facie* case of discriminatory discharge: 1) there is no question that she is a member of a protected class; 2) there is no dispute that she was terminated, JA645; 3) her first-line supervisor and another manager testified that she was meeting expectations at the time of her termination, JA639-41; JA170:16; JA174:21-23; JA137:23-JA138:1; and 4) she was replaced by a person outside of

her protected class, JA647-48; JA151:10-11.  Smyth-Riding also presented evidence that the reasons proffered by SES for her termination were not worthy of credence because the reasons shifted, JA645-46; JA687-89; JA271:4-5; JA280:11-13; JA282:19-21; JA315:1-3; JA281:18-22; JA287:16; JA283:14-16; JA293:11-21, and witnesses gave contradicting testimony about the identity of the decision maker, JA138:5-6; JA149:7-11; JA172:23-24; JA262:20-21; JA264:12-14.

Despite this evidence, the District Court demanded direct evidence of causation.  Although the Court spent little time discussing Smyth-Riding's sex discrimination claim, the limited discussion of it evinces the Court's lack of understanding of the proper framework in cases that do not include direct evidence:

Ms. Dave:     Well, there is no question that plaintiff can establish a prima facie case on all of these issues.

The Court:     That's exactly what I'm challenging.  I need to know where the causation is.

Ms. Dave:     Alright.  As I mentioned earlier, she establishes a prima facie case of sex discrimination because she was replaced by a man . . . .

The Court:     Well, that's not enough.  You can't, just because you are replaced by somebody of the opposite gender doesn't prove gender discrimination.

Ms. Dave:     Your Honor, that's sufficient to establish the prima facie case.  Then we move on to pretext . . . .

The Court:  I thought causation was part of the prima facie case.

Ms. Dave:   The third prong in the pretext argument we can blend --

The Court:  No, I thought causation.  I mean, I thought there had to be . . . That you're discharged because you're a woman.

Ms. Dave:   Right.  So the fact that we've established that she had a positive performance evaluation the month before, and yet Dr. Lee, the decisionmaker [sic], testified that her performance had been "very low level," quote --

JA599:16-JA600:17.

It is clear from this exchange that the Court misapplied the *McDonnell Douglas* framework and ignored the evidence that was sufficient to create an inference that SES fired Smyth-Riding because of her gender.  The District Court also ignored evidence that SES's proffered reasons were merely pretext for discrimination.  JA596:18-22 ("Dr. Lee presented no evidence of what about her performance suddenly declined.  As the Court knows, her performance evaluation from a few weeks before she was fired was exceptional.  That's sufficient evidence, Your Honor, that the jury could conclude that this was pretext."); JA596:23-JA597:2 ("[P]laintiff's witnesses . . . testified that Mr. Joe and Ms. Smyth-Riding were equally responsible for the conflicts between them.  Yet Mr. Joe was never disciplined, and Ms. Smyth-Riding was fired.").

53

## 2.    The District Court improperly ignored the evidence of retaliation.

As detailed above, Smyth-Riding also established a *prima facie* case of retaliation: 1) she engaged in protected activity when she opposed the direction to seek a young female to fill the executive assistant/receptionist position, reported her concerns regarding Joe's discriminatory employment practices, addressed gender-based pay disparities, reported that Prasad asked unlawful questions in an interview, *see supra* Argument I.A; 2) she was denied a pay increase and was fired, JA302:24-JA303:3; JA645-46; and 3) there was a causal connection between her protected activity and the adverse actions.  As evidence of the casual connection, Smyth-Riding introduced testimony from Lee that believed that her performance went from good to "very bad" at the same time that she was opposing SES's discriminatory practices.  *See supra* Argument I.B.2.a.  Lee also stated that he was aware the Smyth-Riding raised a concern regarding Prasad's use of unlawful interview questions.  JA305:9-17.  Additionally, Smyth-Riding introduced evidence of cat's paw influence by Joe and Richard Lee, both of whom had access to Lee, and whose discriminatory practices Smyth-Riding refused to go along with. JA670-73; JA292:17-21; JA293:11-16.

The District Court failed to draw reasonable inferences in favor of Smyth-Riding regarding the casual link between her protected activity and the adverse actions at issue.  These inferences include that Lee's view that Smyth-Riding's

performance decreased significantly in 2008 was connected to Smyth-Riding's protected activity, and that Joe, who had an ongoing conflict with Smyth-Riding about discriminatory employment practices and spoke with Lee about Smyth-Riding, told Lee that Smyth-Riding's oppositional activity was problematic. The District Court also ignored Lee's testimony that he was aware of Smyth-Riding's opposition to interview questions and that Joe told him that Smyth-Riding was riling up employees about their salaries, and Smyth-Riding's testimony that Lee was aware of her efforts to counsel him about unlawful interview questions. JA293:11-22; JA393:13-16; JA305:9-17.

## CONCLUSION

For the foregoing reasons, Appellant, Terri Smyth-Riding, respectfully requests that the Court reverse the District Court's decision and remand these claims for trial.

## STATEMENT REGARDING ORAL ARGUMENT

Appellant Smyth-Riding respectfully requests oral argument, as this matter meets the standards pursuant to Federal Rule of Appellate Procedure 34(a)(2). The instant case involves a legal issue of continuing public interest.

The commitment to trial by jury has been enshrined in the American judicial system from its very origins, with colonial charters and early state constitutions guaranteeing the right to have a case or controversy decided by a jury. *See* John H.

Langbein et al., History of the Common Law 475, 492 (Wolters Kluwer 2009).

Improperly usurping the fact-finding role of the jury undermines this fundamental

principle, and presents a continuing challenge that requires guidance from this

Court.  The instant matter involves significant issues of factual dispute and

credibility, and the weighing of evidence by the district court.  For these reasons,

Appellant requests oral argument.

June 1, 2016                          Respectfully submitted,

                                     /s/ Gary M. Gilbert
                                     Gary M. Gilbert, Esq.
                                     Katherine R. Atkinson, Esq.
                                     The Law Offices of
                                     Gary M. Gilbert & Associates, P.C.
                                     1100 Wayne Avenue, Suite 900
                                     Silver Spring, MD 20910
                                     Telephone: (301) 608-0880
                                     Facsimile: (301) 608-0881

                                     *Counsel for Appellant*

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of Fed. R. App. P.
28.1(e)(2) or 32(a)(7)(B) because:

[ X ] this brief contains [*11,925*] words, excluding the parts of the brief
exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

[    ] this brief uses a monospaced typeface and contains [*state the number
of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P.
32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P.
32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[ X ] this brief has been prepared in a proportionally spaced typeface using
[*Microsoft Word 2007*] in [*14pt Times New Roman*]; *or*

[    ] this brief has been prepared in a monospaced typeface using [*state
name and version of word processing program*] with [*state number of
characters per inch and name of type style*].

Dated: June 1, 2016                         /s/ Gary M. Gilbert
                                            *Counsel for Appellant*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 1st day of June, 2016, I caused this Brief of

Appellant and Joint Appendix to be filed electronically with the Clerk of the Court

using the CM/ECF System, which will send notice of such filing to the following

registered CM/ECF users:

> David C. Tobin
> Ziad P. Haddad
> TOBIN, O'CONNOR & EWING
> 5335 Wisconsin Avenue, NW, Suite 700
> Washington, DC  20015
> (202) 362-5900
>
> *Counsel for Appellees*

I further certify that on this 1st day of June, 2016, I caused the required

copies of the Brief of Appellant and Joint Appendix to be hand filed with the Clerk

of the Court.

/s/ Gary M. Gilbert
*Counsel for Appellant*